

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 02-12-00411-CV

KENNETH P. GROSS AND BETSY L. GROSS

APPELLANTS

V.

WB TEXAS RESORT COMMUNITIES, L.P.

APPELLEE

----------

FROM THE 141ST DISTRICT COURT OF TARRANT COUNTY
TRIAL COURT NO. 141-261873-12

----------

### MEMORANDUM OPINION[1]

----------

Appellants Kenneth P. Gross and Betsy L. Gross bought a lot in the Vaquero Development from Appellee WB Texas Resort Communities, L.P. in 2004. After the lot flooded in 2007, the Grosses bought another lot and a Vaquero club membership before eventually suing WB in 2008 for breach of

----

[1]See Tex. R. App. P. 47.4.

contract, negligent misrepresentation, negligence, and promissory estoppel. They sued Scott Simmons, their neighbor on the adjoining lot, and his successors for negligence, water code violations, nuisance, and trespass. WB moved for summary judgment on all of the Grosses' claims against it, and the trial court granted the summary judgment on all but the promissory estoppel claim.[2] The Grosses raise four issues in this appeal of the trial court's summary judgment.

In their second issue,[3] the Grosses argue that the trial court erred by granting summary judgment for WB on their breach of contract claim, and in part of their fourth issue, they argue that the existence of a written contract does not bar their negligent misrepresentation claim.[4]

WB alleged in its motion and the trial court implicitly found in its judgment that there was no evidence that WB had failed to meet any obligation under the contract's terms.[5] The Grosses claim that they presented more than a scintilla of

---

[2]WB conceded the existence of a fact issue on that claim at the summary judgment hearing. The Grosses nonsuited their promissory estoppel claim against WB, and the trial court granted their motion for severance of their remaining claims against other parties.

[3]The Grosses' first issue is that the trial court erred by granting summary judgment for WB.

[4]The Grosses' negligent misrepresentation claim is actually two claims— one is based on precontractual representations, and the other is based on representations made by WB after the Grosses took ownership of the property.

[5]WB also raised affirmative defenses that the merger doctrine and the "as-is" clause in the deed defeated the Grosses' contract claim. When a party moves

2

evidence "that WB affirmatively misrepresented the condition of the Grosses' lot in the lot contract" and in WB's HUD property report, which they argue was incorporated by reference into the contract, and that WB breached the lot contract by failing to convey a lot that was suitable for construction of a residence. Essentially, we are asked to consider whether the HUD property report is part of the contract and, if it is, whether there is evidence of breach sufficient to raise a fact issue.

The plain language of the contract by itself does not reflect that WB made any representations regarding the property's suitability for any particular use. Its terms provide for WB to sell and for the Grosses to buy Lot 3, Block M, Vaquero—Arthur Addition, phase 3, vacant land, "on the terms and conditions set forth" in the contract for $550,000, with delivery of a special warranty deed conveying the property to the Grosses upon close of escrow. The Grosses initialed the contract under the statement in clause 5 that "Buyer acknowledges (i) having been given the opportunity to inspect the Property prior to the time of signing this Purchase Contract. Buyer hereby indicates Buyer's approval and acceptance of such inspection[.]"

The contract also contains the following clause:

---

for summary judgment under both rules 166a(c) and 166a(i), we will first review the trial court's judgment under the standards of rule 166a(i). *Ford Motor Co. v. Ridgway*, 135 S.W.3d 598, 600 (Tex. 2004). If the appellant failed to produce more than a scintilla of evidence under that burden, then there is no need to analyze whether the appellee's summary judgment proof satisfied the less stringent rule 166a(c) burden. *Id.*

9. **Entire Agreement:** No sales person, employee or agent of Seller has authority to make any representations to Buyer that are not signed by Seller or to modify the terms of this Purchase Contract or any other written agreement signed by Seller, and Buyer acknowledges that none have been made. This Purchase Contract and any addenda or supplements signed by both of the parties hereto constitutes the entire agreement between Seller and Buyer and supersedes any other written or oral agreements between Seller and Buyer. No amendment or modification of the terms hereof or in any other written agreement shall be binding upon either party unless signed by both of the parties hereto.

Clause 22 of the contract, "Home Construction," includes the buyer's

acknowledgment that he is purchasing the lot as vacant land and that

all improvements including, without limitation, any residence, building or other structure erected on the Property and the grading, landscaping and other improvements thereon may be undertaken or constructed after specific approval thereof by the Design Review Committee in accordance with the provisions of the Declaration and the Design Guidelines for Vaquero, and all amendments and supplements thereto, and by the Town of Westlake.

However, it makes no representations about the lot's suitability for these uses.

And the contract contains the following after its cancellation or rescission

clause:

**REPRESENTATIONS:** THE ONLY REPRESENTATIONS BY SELLER, ITS EMPLOYEES, OR AGENTS, ARE AS SET FORTH HEREIN. BUYER ACKNOWLEDGES THAT NO OTHER REPRESENTATIONS HAVE BEEN MADE TO OR RELIED UPON BY BUYER. BUYER FURTHER ACKNOWLEDGES THAT NO REPRESENTATIONS HAVE BEEN MADE BY SELLER, ITS EMPLOYEES, OR AGENTS REGARDING VIEWS FROM THE PROPERTY. BUYER FURTHER ACKNOWLEDGES AND ACCEPTS THAT IT IS SELLER'S PRESENT INTENTION TO DEVELOP VAQUERO SUBSTANTIALLY IN ACCORDANCE WITH THE CURRENT MASTER PLAN BUT THAT THE MASTER PLAN IS SUBJECT TO CHANGE AND FUTURE CIRCUMSTANCES

4

COULD PREVENT THE CONSTRUCTION OR OPERATION OF ONE OR MORE OF THE PLANNED AMENITIES.

**YOU HAVE THE OPTION TO CANCEL YOUR CONTRACT OR AGREEMENT OF SALE BY NOTICE TO THE SELLER UNTIL MIDNIGHT OF THE SEVENTH DAY FOLLOWING THE SIGNING OF THE CONTRACT OR AGREEMENT. IF YOU DID NOT RECEIVE A PROPERTY REPORT PREPARED PURSUANT TO THE RULES AND REGULATIONS OF THE OFFICE OF INTERSTATE LAND SALES REGISTRATION, U.S. DEPARTMENT OF HOUSING AND URBAN DEVELOPMENT,[6] IN ADVANCE OF YOUR SIGNING THE CONTRACT OR AGREEMENT, THE CONTRACT OR AGREEMENT OF SALE MAY BE CANCELLED AT YOUR OPTION FOR TWO YEARS FROM THE DATE OF SIGNING.**

Both parties signed the contract in September 2004, and WB conveyed the property to the Grosses by a special warranty deed dated November 5, 2004. The HUD property report is dated April 30, 2004.

Documents incorporated into a contract by reference become part of the contract. *In re 24R, Inc.*, 324 S.W.3d 564, 567 (Tex. 2010) (orig. proceeding). However, such documents must actually be incorporated—the language used is unimportant, but the signed document must "plainly refer[]" to the document, which "requires more than merely mentioning the document." *Bob Montgomery Chevrolet, Inc. v. Dent Zone Co.*, 409 S.W.3d 181, 189 (Tex. App.—Dallas 2013, no pet.). The language of the signed document must show that the parties intended for the other document to become a part of the agreement. *Id.* at 190.

---

[6]This clause's "property report prepared pursuant to the rules and regulations of the Office of Interstate Land Sales Registration, U.S. Department of Housing and Urban Development" is the parties' "HUD property report."

("[T]he referring language in the original document must demonstrate the parties intended to incorporate all or part of the referenced document.").

In *Dent Zone*, for example, the Dallas court concluded that the statement, "Additional benefits, qualifications and details of the PDR LINX Service Program are available for your review at our website," did not incorporate the internet document by reference into the contract when this language did not state that the internet document was incorporated by reference in the parties' agreement, did not plainly refer to the additional terms and conditions in the internet document as becoming part of the parties' agreement, and did not otherwise suggest that the parties intended for the internet document to become part of their agreement; instead, it indicated that the internet document contained informative material only, not binding terms and conditions intended to be part of the parties' contract. *Id.* at 190, 193; *cf. In re Prudential Ins. Co. of Am.*, 148 S.W.3d 124, 135 (Tex. 2004) (orig. proceeding) (holding that lease's jury waiver was incorporated by reference into guaranty agreement, which "plainly refer[red]" to the lease when guarantors agreed to "faithfully perform and fulfill all of [the] terms, covenants, conditions, provisions, and agreements" of the lease if the partnership defaulted); *MTrust Corp. v. LJH Corp.*, 837 S.W.2d 250, 253–54 (Tex. App.—Fort Worth 1992, writ denied) (observing that on contract's first page, reference was made to "Exhibit 'B' attached hereto and incorporated herein by reference for all purposes").

6

Although the Grosses argue that the HUD property report was incorporated by reference into the contract, as set out above, there is no language in the contract that indicates any intent to incorporate it.[7] Therefore, we conclude that it was not incorporated by reference into the contract. And because there is no evidence to show that WB made any representations in the contract itself regarding the property's suitability for a particular use, we overrule this portion of the Grosses' first and second issues and do not reach the remainder of the Grosses' breach-of-contract arguments in their second issue. *See* Tex. R. App. P. 47.1.

Further, a cause of action for negligent misrepresentation requires a showing of justifiable reliance by the plaintiff. *Fed. Land Bank Ass'n of Tyler v.*

---

[7]The Grosses cite *Owen v. Hendricks*, 433 S.W.2d 164, 166 (Tex. 1968), for the proposition that we must construe the documents together, and they cite two Virginia cases for the proposition that mentioning a HUD property report in a contract makes it a part of the contract. In *Owen*, the court observed that it had been suggested that "internal references may be dispensed with if, in the light of the surrounding circumstances, the court is convinced that no fraud is being perpetrated and that the several writings, taken together, evidence with reasonable certitude the terms of the contract." 433 S.W.2d at 166–67. The terms of the contract here are certain, specifically exclude any documents not signed by both parties, and refer to the HUD property report only in the context of the consequences of WB's failure to provide it to the Grosses, not the incorporation of the report's contents; therefore, *Owen* is inapposite. *Cf. id.* at 165, 167 (holding that two letters between plaintiff and defendant, while obviously related to the same subject matter, could not be taken together as constituting the written memorandum describing land as required by statute). And although the two Virginia cases cited by the Grosses are directly on-point, they are not binding on us; as stated above, incorporation by reference in Texas requires more than a mere mention. *Cf. High Knob Assocs. v. Douglas*, 457 S.E.2d 349, 354–55 (Va. 1995); *Marriott v. Harris*, 368 S.E.2d 225, 232 (Va. 1988).

7

*Sloane*, 825 S.W.2d 439, 442 (Tex. 1991); *Cunningham v. Blue Cross Blue Shield of Tex.*, No. 02-06-00363-CV, 2008 WL 467399, at *5 (Tex. App.—Fort Worth Feb. 21, 2008, pet. denied) (mem. op. on reh'g). When a contract between the parties directly contradicts the alleged misrepresentations, there can be no justifiable reliance. *Miller Global Props., LLC v. Marriott Int'l, Inc.*, 418 S.W.3d 342, 348 (Tex. App.—Dallas 2013, pet. denied). WB moved for summary judgment on the basis that the express contract between the parties barred the Grosses' negligent misrepresentation claim as a matter of law. Based on the express language of the contract set out above, we conclude that the trial court also correctly granted summary judgment on the Grosses' negligent misrepresentation claim based on pre-contractual representations by WB because the Grosses could not show justifiable reliance in light of the contract's express terms. *See id.* Therefore, we overrule this portion of the Grosses' first and fourth issues.

In their third issue, the Grosses argue that based on the totality of the circumstances, they presented evidence that raised a genuine issue of material fact as to whether the "as is" clause in the special warranty deed applied to their claims.

Generally, a valid "as is" agreement negates the element of causation necessary to recover on claims regarding the physical condition of property, but it is not determinative in every circumstance. *Welwood v. Cypress Creek Estates, Inc.,* 205 S.W.3d 722, 726–27 (Tex. App.—Dallas 2006, no pet.) (citing

8

*Prudential Ins. Co. of Am. v. Jefferson Assocs.,* 896 S.W.2d 156, 161 (Tex. 1995)). Fraudulent inducement and impairment of inspection are two bases to avoid an "as-is" clause. *Prudential*, 896 S.W.2d at 162. Likewise, an "as-is" clause may not negate causation when considering the totality of the circumstances and such factors as the sophistication of the parties and whether they were represented by counsel, whether the contract was an arm's length transaction, the relative bargaining power of the parties and whether the contractual language was freely negotiated, and whether the language was an important part of the parties' bargain and not simply added as a boilerplate provision. *Id.*; *Warehouse Assocs. Corp. Centre II v. Celotex Corp.*, 192 S.W.3d 225, 230 n.4 (Tex. App.—Houston [14th Dist.] 2006, pet. denied) (observing that whether the parties were represented by counsel is a consideration in an "as is" clause's viability).

WB moved for summary judgment arguing that the "as is" clause was a substantial part of the bargain between it and purchasers in the Vaquero development, that Kenneth was an experienced and sophisticated homebuilder, and that there "is no evidence that the purchase of this property or the subsequent deed execution were not 'freely negotiated by similarly sophisticated parties as part of the bargain in an arms[-]length transaction.'"[8] In his affidavit,

---

[8]When reviewing a no-evidence summary judgment, we examine the entire record in the light most favorable to the nonmovant, indulging every reasonable inference and resolving any doubts against the motion. *Sudan v. Sudan*, 199 S.W.3d 291, 292 (Tex. 2006). We credit evidence favorable to the nonmovant if

9

WB representative Steve Yetts stated that the inclusion of the "as is" clause was "a substantial part of the purchase agreement between WB and purchasers of lots in the Vaquero Development, such as Gross," and he stated that without the inclusion of the clause, WB would not have completed the sale of any lot to any purchaser in the development.

The Grosses responded that the "as is" clause did not negate causation because it was not a bargained-for contract term, it was not entered into in an attempt to resolve a dispute, the parties were not represented by counsel, and the Grosses were not sophisticated parties.

The "as is" clause in the special warranty deed is comprehensive, set out in capital letters, and includes the specific negation and disclaimer of any

reasonable jurors could, and we disregard evidence contrary to the nonmovant unless reasonable jurors could not. *Timpte Indus., Inc. v. Gish*, 286 S.W.3d 306, 310 (Tex. 2009) (quoting *Mack Trucks, Inc. v. Tamez*, 206 S.W.3d 572, 582 (Tex. 2006)). If the nonmovant brings forward more than a scintilla of probative evidence that raises a genuine issue of material fact, then a no-evidence summary judgment is not proper. *Smith v. O'Donnell*, 288 S.W.3d 417, 424 (Tex. 2009); *King Ranch, Inc. v. Chapman*, 118 S.W.3d 742, 751 (Tex. 2003), *cert. denied*, 541 U.S. 1030 (2004).

When reviewing a traditional summary judgment on an affirmative defense, the defendant must conclusively prove all of the elements of its affirmative defense. *Frost Nat'l Bank v. Fernandez*, 315 S.W.3d 494, 508–09 (Tex. 2010), *cert. denied*, 131 S. Ct. 1017 (2011); *see* Tex. R. Civ. P. 166a(b), (c). We consider the evidence presented in the light most favorable to the nonmovant, crediting evidence favorable to the nonmovant if reasonable jurors could, and disregarding evidence contrary to the nonmovant unless reasonable jurors could not. *Mann Frankfort Stein & Lipp Advisors, Inc. v. Fielding*, 289 S.W.3d 844, 848 (Tex. 2009). We indulge every reasonable inference and resolve any doubts in the nonmovant's favor. *20801, Inc. v. Parker*, 249 S.W.3d 392, 399 (Tex. 2008).

representations, warranties, promises, covenants, agreements, or guaranties "of any kind or character whatsoever, whether express or implied, oral or written, past, present, or future, of, as to, concerning or with respect to" essentially any aspect of the property.

Kenneth testified that his real estate experience before buying the lot from WB consisted of having rebuilt his own home and those of two others, working on "multiple remodels," and purchasing several new homes. He had undertaken "a handful"—five to seven—building projects that involved building a new home from the ground up, but all of the buyers of those houses had already owned the lots. Before purchasing the lot from WB, Kenneth had built only one other house where he acquired an empty lot and built a home before finding a buyer.

Before buying the lot, Kenneth went to the lot and walked around, but the lot's back third "was nothing but a sheer mass of grapevines . . . and sticker bushes," and WB had written on the tear sheet "existing tree mass" over that area. The 1-1/3 acre lot had a definite slope, higher on the west and lower on the east, but was relatively flat in the center and seemed "pretty buildable." He did not see any evidence of washout or runoff that crossed over the property, such as cuts, gullies, or swales that would indicate that the property had heavy water flow across it.

Kenneth testified that he had had a chance to read the special warranty deed but that "[a]t the time, we just signed the documents, really." He agreed that he was given an opportunity to read the documents, that nobody told him not

11

to read the documents, and that he could have read them if he had wanted to but that WB's sales representative had told him that the property was free and clear of any water issues; he stated, "I've got to believe what somebody tells me." He further testified, "I have to assume that when I'm buying a property that the developer knows what they're doing. They've developed, you know, 20 other properties. They're supposed to be the premier developer in the world." When asked whether he was aware of the "as is" clause, Kenneth stated, "I'm aware of it now." In the portion of his deposition that WB provided in its summary judgment evidence, Kenneth followed that statement by saying, "But at the same time, you know, I was given a document that said there were no problems. So— and I expect that any developer developing land would not have a river running through a property." He also stated, "I'm not a developer, but I had to assume that there were no issues. And . . . it would be one thing if Kimley-Horn [WB's engineering consultant] didn't have the 44 acres of watershed on that construction document . . . [b]ut they did."

> Kenneth testified that after the flooding, Yetts
>
> said that there was a boat load of water coming through and we needed to all work together to get this resolved and that they would resolve it and that's why they were having the meeting. . . . And I felt everybody was, you know, there in good faith to—to take care of the problem.

Kenneth said that Yetts and everyone else agreed that there was an issue and that "everybody, [he] thought, agreed that the issue was going to be taken care

12

of." He bought a second lot and a club membership from WB because he "had every reason to believe that [WB] would step up and ultimately do the right thing."

Kenneth had a realtor, not an attorney, when he bought the first lot. He did not see the master drainage or master grading plan. Kenneth stated that he did not have "300 homes like [fellow homebuilder] Simmons," but that he had built enough that if he was building something, he had "to assume that what the developer is giving [him] is a clean product, so to speak, and that [he] can build on the lot." Kenneth further testified, "[I]f I were buying a raw piece of land, I would do more due diligence than I did. But when I'm buying something from a developer, I'm assuming that it was the developer's responsibility and/or the engineering firm."

In additional portions of Kenneth's deposition attached to WB's motion, Kenneth testified that he had a bachelor's degree in plant science and had never worked as a construction tradesman. The only house he had previously built as a spec home on an empty lot was a property that he lived in from 2005 to 2007. Kenneth stated that his realtor had also bought a home in the Vaquero development and had recommended it to him.

Kenneth said that after all of the water problems, he cleaned out the sticker bushes and grapevines so that he could see what was happening at the back of the property

> [a]nd even when you look at it today, it doesn't really look like a dry creek bed. Right at the very, very rear of the property you can see because the fence is now pushed over from all the water—and

13

there's a ton of debris, so you can kind of see where the impact of
the water is.

Kenneth also testified that in his experience, he had never had to hire an engineer to handle water problems but that he had not "built on a lot of lots."

Although WB contends that Kenneth's testimony establishes that he was an experienced and sophisticated homebuilder, we think that the summary judgment evidence, viewed in the light most favorable to the Grosses, shows that he had little experience in purchasing land from a developer. And although Yetts stated in his affidavit that the "as is" clause was a critical term of the purchase agreement, Kenneth's testimony makes clear that Kenneth, who was not represented by counsel, was not aware of its importance to WB at the time that they made the agreement, further reinforcing his lack of sophistication in the bargaining process. We sustain this portion of the Grosses' third issue as it relates to the remaining negligence and postcontractual negligent misrepresentation claims and the portion of their first issue that pertains to these claims and do not reach the remainder of their third issue. *See* Tex. R. App. P. 47.1.

The Grosses argue in part of their fourth issue that the economic loss rule does not bar their negligence claims or the remaining negligent misrepresentation claim.

The Grosses claimed in their pleadings that WB made negligent misrepresentations to them after the flooding when it stated that it would remedy

the problems and then failed to do so and that WB owed them a duty to ensure that water flow across the development would not negatively affect their lot, a duty to disclose the water drainage issues to them, and an ongoing duty to ensure that construction on other lots did not negatively affect their lot. They contended that due to these misrepresentations and WB's breaches of its duties, they suffered "damages to [their] Lot, loss of the use and enjoyment of the Lot, diminution in the value of [their] Lot, costs associated with the Lot, loss of prospective business, loss of credit reputation, and cost of delay in performance," as well as additional damages for the purchase and costs associated with the second lot and club membership, all of which they claim on appeal are injuries independent of the contract.

The Grosses alleged in their pleadings that erosion had occurred on the lot, and Kenneth referenced the need for repairs to the property in his deposition. Kenneth testified that water ran through the lot's rear at a "significant rate" and across his building pad, preventing him from building a house on the lot, and that one of the proposed solutions required him to assume additional liability.[9] Glen

---

[9]Kenneth testified,

> I have objected all along to what would become a serious vortex of water on my property and create a significant liability if a child or pet or somebody were to get in that water and be sucked into a pipe and—and shot out the other side, you know, a length greater than a football field.

Kenneth described this proposed solution as a burden that would result in "destruction of the property."

Dixon, the Grosses' expert, testified that he saw water "ponding" on the low-lying side of the Grosses' lot and that forty-seven acres of other residential properties drained onto and across the Grosses' lot and Simmons's lot.

Kenneth testified that after Simmons and others built their homes with the Design Review Committee's approval, the flow of water onto his property increased and that WB acknowledged that there was a significant issue with the property. He further testified that "[he didn't] want water eroding through [his] property." Kenneth said that Yetts "tried to blame Mr. Simmons for a majority of the problem and claimed that if Mr. Simmons hadn't built his home and benched up his lot, that the damage to [the Grosses'] lot would be minimal."

Kenneth testified that he had bought a second lot after the flooding issue arose on the first lot "under the pretense that it was going to eventually be taken care of." Kenneth stated that he had paid $175,000 for the club membership "sometime since '07." He further stated, "After the flooding issue arose, it became evident that this was going to be a—a protracted repair." Kenneth testified that the Design Review Committee and homeowner's association, which were not parties, would not let him do anything on the lot while the water problem existed. The HUD property report reflects that WB controlled the Vaquero Homeowners Association and would continue to do so until 80% of the lots in the subdivision had been sold.

At the time of Kenneth's deposition, he was facing foreclosure on the second lot and had been forced to cash out $250,000 from his individual

16

retirement accounts to try to make payments, facing serious penalties and tax consequences for early withdrawal.

The contractual relationship of the parties may create duties under both contract and tort law, and their acts may breach duties in tort, contract, or both simultaneously. *Jim Walter Homes, Inc. v. Reed*, 711 S.W.2d 617, 618 (Tex. 1986). When the injury is only the economic loss to the subject of the contract itself, the action sounds in contract alone. *Id.* (holding that when the Reeds' injury was that the house they were promised and paid for was not the house they received, the cause of action was for breach of contract); *see also Cactus Well Serv., Inc. v. Energico Prod. Inc.*, No. 02-13-00186-CV, 2014 WL 6493231, at *3 (Tex. App.—Fort Worth Nov. 20, 2014, no pet. h.) (mem. op.) (stating that when claims for both negligent misrepresentation and breach of contract arise out of the same facts, the plaintiff may recover for negligent misrepresentation only upon showing that it suffered damages as a result of the alleged misrepresentation that were independent of any benefit-of-the-bargain damages resulting from the breach of contract).

The Grosses argue that they are seeking not only benefit-of-the-bargain damages for breach of contract but also damages for the diminution in the value of the lot and consequential damages associated with having the lot but being unable to build on it, such as loss of prospective business, loss of credit

17

reputation, and costs of delay in performance.[10]  While the supreme court has repeatedly reaffirmed that when the only injury is economic loss to the subject matter of the contract, the plaintiff's action sounds in contract, *see LAN/STV v. Martin K. Eby Constr. Co.*, 435 S.W.3d 234, 242 n.35 (Tex. 2014), we think that the Grosses' evidence raises a genuine issue of material fact with regard to the types of losses they have sustained that go beyond the benefit of the bargain. *See Sharyland Water Supply Corp. v. City of Alton*, 354 S.W.3d 407, 420 (Tex. 2011) ("Costs of repair necessarily imply that the [water] system was damaged."); *see also Chapman Custom Homes, Inc. v. Dallas Plumbing Co.*, No. 13-0776, 2014 WL 4116839, at *2 (Tex. Aug. 22, 2014) ("[A] party states a tort claim when the duty allegedly breached is independent of the contractual undertaking and the harm suffered is not merely the economic loss of a contractual benefit.").  The Grosses' negligent misrepresentation claim pertaining to WB's postcontractual

---

[10]The Grosses were homebuilders and planned to build a home on the lot that they would live in and use to showcase their homebuilding talent.  While WB also claimed that the Grosses had no evidence that the lot is unsuitable for residential construction, Dixon testified that drainage from forty-seven acres of property is something that a typical residential lot would not be capable of handling without some improvement on it, typically a drainage easement.  The Grosses also attached to their response the July 9, 2007 letter from Simmons's expert, which stated that the amount of water flowing exceeded the capacity of the street and that Kimley-Horn's construction plans did not mention how drainage was to be handled by the homebuilders.  Simmons testified that Gross's property was at a higher elevation than his property, that the water flowed across Gross's property to Simmons's property, and that if he had known about the amount of water, he would not have built a home on his property.  Simmons stated that in August 2008, his expert prepared a plan for a catch basin on the Grosses' property to resolve the water issues.

18

assurance that it would remedy the water issues is independent of the contract, and the Grosses' reliance on that representation to purchase an additional lot and a club membership has resulted in alleged damages, including loss of credit reputation, that are also independent of the contract. And the Grosses produced evidence to support a genuine issue of material fact with regard to actual damage to the property as a result of WB's having approved construction on other lots. Therefore, we sustain this portion of the Grosses' first and fourth issues.

Having overruled the Grosses' second issue and part of their first issue, we affirm the trial court's summary judgment on their breach-of-contract claim and on their precontractual negligent misrepresentation claim. Having sustained the portions of the Grosses' third and fourth issues (and related portions of their first issue) on their negligence and postcontractual negligent misrepresentation claims, we reverse the trial court's summary judgment on these claims and remand this case to the trial court for further proceedings on those claims.

/s/ Bob McCoy
BOB MCCOY
JUSTICE

PANEL: MCCOY and GABRIEL, JJ.; WILLIAM BRIGHAM (Senior Justice, Retired, Sitting by Assignment).

DELIVERED: December 23, 2014